IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Billy Jones, ) | |
| ) | Civil Action No. 6:05-2170-RBH-WMC |
| Plaintiff, ) | |
| ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. ) | |
| ) | |
| Jo Anne B. Barnhart, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |
| ) | |

This case is before the court for a report and recommendation pursuant to Local Rule 73.02(B)(2)(a), D.S.C., concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. Section 405(g), to obtain judicial review of a final decision of the Commissioner of Social Security Administration that the plaintiff was not entitled to disability insurance benefits ("DIB").

## ADMINISTRATIVE PROCEEDINGS

The plaintiff has previously filed several applications for benefits. He was awarded disability insurance benefits in July 1977, which were subsequently terminated in July 1982. On July 14, 2002, the plaintiff filed an application for supplemental security income ("SSI") benefits, which was denied through the hearing level with no further action.

---

[1] A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

On July 27, 1995, the plaintiff again filed for SSI and on August 10, 1995, for DIB. These claims were denied initially and no further action was taken.

The plaintiff filed his current application for DIB on January 7, 1997, alleging disability beginning October 21, 1991.[2] The application was denied initially and on reconsideration. On February 24, 1999, following a hearing attended by the plaintiff and his attorney, the ALJ determined that the plaintiff was not entitled to benefits. On October 29, 2001, the Appeals Council remanded the case with instructions to further consider examining source opinions, as well as the plaintiff's mental impairments and maximum residual functional capacity, and obtain evidence from a vocational expert.

A supplemental hearing was held on January 9, 2002, at which the plaintiff, his attorney, and a vocational expert appeared. On October 25, 2002, the ALJ again found the plaintiff was not entitled to benefits. On August 20, 2003, the Appeals Council again remanded the case for further proceedings, including giving consideration to the examining source opinions, evaluating the plaintiff's mental impairments, and obtaining supplemental evidence from a vocational expert. The case was also reassigned at this time to a different ALJ.

A third hearing was held on November 17, 2003, at which the plaintiff, his attorney, and a vocational expert appeared. On April 6, 2004, the new ALJ also determined that the plaintiff was not entitled to benefits. This determination became the final decision of the Commissioner when it was adopted by the Appeals Council on June 17, 2005.

In making the determination that the plaintiff was not entitled to benefits, the ALJ made the following findings:

> (1) The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in

---

[2]At the November 17, 2003, hearing, the plaintiff's counsel amended the disability onset date to March 26, 1994.

2

Section 216(I) of the Social Security Act and is insured for benefits through September 30. 1997, but not thereafter.

(2)    The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

(3)    The claimant's chronic pain syndrome, seizure disorder, depression and avoidant personality disorder are considered "severe" based on the requirements in the Regulations 20 CFR § 404.1520(c).

(4)    These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

(5)    The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

(6)    The claimant has the following residual functional capacity: frequently lift and carry up to two to three pounds; occasionally lift and carry up to ten pounds; is restricted to work that is repetitive and with a low stress environment; and is restricted from hazards including heights and dangerous machinery.

(7)    The claimant is unable to perform any of his past relevant work (20 CFR § 404.1565).

(8)    The claimant was a younger individual age 18-44 on March 16, 1996, and was a younger individual age 45-49 on September 30, 1997, his date last insured (20 CFR §§ 404.1563 and 416.963).

(9)    The claimant has "a limited education" (20 CFR § 404.1564).

(10)   The claimant has transferable skills from skilled work previously performed as described in the body of the decision (20 CFR § 404.1568).

(11)   The claimant has the residual functional capacity to perform a significant range of sedentary work (20 CFR § 404.1567).

(12)   Although the claimant's exertional limitations do not allow him to perform the full range of sedentary work, using Medical-Vocational Rules 201.26 and 201.20 as a framework

>for decision-making, there are a significant number of jobs in the national economy that he could perform.
>
>(13)   The claimant was not under a "disability," as defined in the Social Security Act, at any time through September 30, 1997, the date he last met the insured status requirements of Title 11 of the Social Security Act (20 CFR § 404.1520(f)).

The only issues before the court are whether the findings of fact are supported by substantial evidence and whether proper legal standards were applied.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. §423(a).  "Disability" is defined in 42 U.S.C. §423(d)(1)(A) as:

>the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment which prevents past relevant work, and (5) has an impairment which prevents him from doing substantial gainful employment.  20 C.F.R. §404.1520.  If an individual is found not disabled at any step, further inquiry is unnecessary.  20 C.F.R. §404.1503(a).  *Hall v. Harris*, 658 F.2d 260 (4th Cir. 1981).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. §423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Richardson v. Perales*, 402 U.S. 389 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that her conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

The plaintiff was born on April 28, 1952, and was 45 years old on September 30, 1997, the date he was last insured for benefits. He has an eighth-grade education and has worked as an assembler. He alleges disability as of March 26, 1994, due to problems with his back and legs, epilepsy, diabetes mellitus, high blood pressure, thyroid problems and depression.

The record reveals that the plaintiff was involved in a car accident in which he was rear-ended in October 1991. In March 1992, the plaintiff was hospitalized with complaints of pain in his back, neck and left leg. An MRI of his lumbar spine showed some degenerative disc disease only at the L5-Sl level, and an MRI scan of his neck was negative. A bone scan showed no abnormality of the spine, with increased intake over the right ankle consistent with some degenerative changes. Discharge diagnoses were neck and back pain with headaches, status post flexion-extension injury, generalized deconditioning and seizure disorder (Tr. 314-16).

In July of 1992, the plaintiff underwent a psychological evaluation by Dr. Ralph D. Bruno, who stated that the claimant's test results were consistent with an individual who had psvchophysiologic symptoms. Hypothesized diagnostic impressions consisted of dysthymic disorder accompanied by medical conditions secondary to sympathetic nervous system overarousal (Tr. 317-22).

6

In January of 1994, the plaintiff underwent a consultative psychological examination by Dr. John B. Bradley. Dr. Bradley stated that the plaintiff appeared depressed, apathetic, tense and anxious, but did not display symptoms of serious psychopathology during the evaluation. Dr. Bradley diagnosed the plaintiff with avoidant personality disorder (Tr. 309-11).

From April of 1994 through September of 2003, the record indicates that Drs. J. William Thurmond, III, Paul M. Fischer and Blake Mitchell treated the claimant for conditions including chronic pain syndrome, chronic back pain, seizure disorder, and depression, and prescribed medications including Tegretol, Relafen, and Deservl (Tr. 296-304, 387-99). At a December 8, 1995, visit, which is the first visit in the record that is just prior to the period in question, Dr. Mitchell noted that the plaintiff was "apparently doing pretty well" and was "stable" with his seizure disorder, chronic pain syndrome and depression. Despite not taking his Tegretol, the plaintiff denied any seizures. The plaintiff also denied shortness of breath and chest pain (Tr. 299).

On December 7, 1995, the plaintiff underwent a psychiatric evaluation by Dr. David Steiner (Tr. 118-19). Dr. Steiner noted that the plaintiff had a diagnosis of major depression that was previously based on evaluation after suffering from chronic pain. He further noted that the plaintiff appeared to have some mild psychomotor retardation that could be a result of the medications, Trazodone and Tegretol, that he was taking.

Dr. Thurmond saw the plaintiff on August 16, 1996, and noted that he had had seizures since his last visit in December 1995 and was still quite depressed. He further noted that the plaintiff complained of chronic back pain and shoulder pain. Dr. Thurmond refilled his medications and advised a follow-up visit in three months (Tr. 298).

Dr. Thurmond saw the plaintiff again on March 24, 1997, and noted that he was still having a great deal of back trouble and was "unable to bend, twist, stoop, or do anything much because of his back pain." Upon examination, he found that the plaintiff had

7

"painful range of motion of his back and very diminished restricted range of motion of his back." Dr. Thurmond also commented that the plaintiff had a seizure since his last visit. He continued the plaintiff using prescription medication (Tr. 297).

On April 1, 1997, the plaintiff underwent a psychological consultative examination by Dr. James M. Schear. The plaintiff reported activities including vacuuming floors, washing dishes, folding clothes, making beds, and shopping with his mother. Dr. Schear diagnosed the plaintiff with features of pain disorder due to psychological factors and general medical condition; seizure disorder, by history, by plaintiff's self-report; and osteoporosis of the neck and back, by history, by plaintiff's self-report. Dr. Schear stated that the plaintiff's current psychometric test results are considered to be a lower bound estimate of his true ability. Performances are generally within the low average to average range and achievement abilities are below the plaintiff's formal academic achievement. Dr. Schear stated that the plaintiff's ability to understand and follow simple instructions is good. His ability to get along with others in a work environment is fair to poor. His ability to sustain focused attention that would permit timely completion of assigned tasks is fair. He is likely to experience difficulty coping with minimal levels of stress. The plaintiff's achievement abilities ranked at the fifth grade level, and his IQ was in the low average range with a score of 81 (Tr. 305-08).

Opinions were also provided by non-examining state agency physicians. On June 30, 1997, a residual physical functional assessment of the plaintiff revealed the following limitations: occasionally lift and/or carry 50 pounds; frequently lift/carry 25 pounds; stand and/or walk (with normal breaks) for a total of six hours in an eight-hour workday; sit (with normal breaks) for about six hours in an eight-hour workday; occasionally climb ramp/stairs; never climb ropes, scaffolds; occasionally stooping; avoid concentrated exposure to hazards; and precludes heavy work (Tr. 236-243). A mental residual functional capacity assessment was also done, which revealed the following limitations: moderately

limited ability to understand and remember detailed instructions; moderately limited ability to carry out detailed instructions; moderately limited ability to interact appropriately with the general public; moderately limited ability to set realistic goals or make plans independently of others (Tr. 253-255). A second mental residual functional capacity assessment was done on December 11, 1997, which noted the same restrictions as before except that the plaintiff's ability to set realistic goals or make plans independently of others was marked as not significantly limited (Tr. 263-265). A second physical residual functional capacity assessment was done on December 19, 1997, which noted the same restrictions except for the following: ability to climb rope and scaffolds was noted as occasionally; kneeling and balancing occasionally (Tr. 275-282).

In November 1997, the plaintiff reported having a couple of seizures over the last several months and lower back pain that was not improving. He stated that he was doing some exercises every day. Dr. Thurmond noted that the plaintiff appeared depressed, but was awake, alert, and oriented. The plaintiff reported pain upon range of motion of the back. Dr. Thurmond stated that the plaintiff had reduced range of motion of the back, full range of motion of the neck, and no edema with the extremities. The plaintiff's medications were again continued at the same strength. Dr. Thurmond instructed the plaintiff to walk every day without fail and to increase his activity level.

On September 22, 2003, Dr. Thurmond completed a Seizures Residual Functional Capacity Questionnaire form in which he indicated that he has treated the plaintiff since 1995. Dr. Thurmond indicated that the plaintiff has, on average, one to two grand mal seizures a month lasting a few minutes with loss of consciousness. He further indicated that after a seizure the plaintiff has manifestations of confusion and exhaustion lasting from five to 10 minutes, up to 30 minutes. Dr. Thurmond stated that the plaintiff takes Tegretol three times a day with partial response, with no side effects from the medication. The plaintiff's seizures were likely to disrupt the work of co-workers; he would

9

need more supervision than an unimpaired worker; and he is unable to work at heights, operate power machines or a motor vehicle. Dr. Thurmond indicated that the plaintiff does not have any associated mental problems including depression, irritability, social isolation, poor self-esteem, short attention span, memory problems, or behavior extremes. Dr. Thurmond stated that the plaintiff would sometimes need to take unscheduled breaks on average of 15 minutes twice a day, and he was capable of low stress jobs. On average, Dr. Thurmond indicated that the plaintiff would likely be absent from work about three times a month. When asked about any other limitations such as the ability to sit, stand, walk, lift, bend, and stoop, Dr. Thurmond did not indicate any limitations (Tr. 387-92).

At the hearing held on November 17, 2003, the plaintiff's counsel stated that the plaintiff was alleging an onset date of March 26, 1994. The plaintiff testified that he was 51 years old, 5'4" tall and weighed 120 pounds. He stated that he lived alone in a mobile home and was not responsible for any yard work. He further testified that he could read and write and had an eighth-grade education. The plaintiff stated that he was living on money provided to him by his mother who is able to work. The plaintiff testified that he did not drink alcohol or take street drugs. He stated that he smoked a pack of cigarettes a day.

The plaintiff testified that he lasted worked in 2001 at a job setting up mobile homes. He explained that his father helped him to obtain that job and he held it for six weeks before he was terminated. He stated that he did not know what month he was fired but believed it occurred in the spring. The plaintiff testified that the job required lifting and some crawling, with the heaviest thing he had to lift each day being concrete blocks but he could not estimate what one weighed. He testified that before working at the above-mentioned job, he was employed for 10 years in a job which required him to lift over 100 pounds. The plaintiff testified that before that job, he worked primarily construction jobs as a carpenter's helper.

The plaintiff further testified that he had had problems with his back, knees, and short-term memory since a 1991 automobile accident, in which he suffered a head injury. He stated that he was placed on medication to treat depression but was not currently taking the medication because he was unable to afford it. The plaintiff testified that the medication does seem to help when he is able to take it. He explained that he was currently experiencing problems caused by his depression such as an inability to deal with others. The plaintiff testified that he regularly experienced memory problems. He stated that he had problems with his lower back and the area between his shoulder blades. He stated that his lower back bothers him when he stands, sits, or walks for any length of time. He testified that his knees pop out of joint and swell up causing him to be unable to bend. He stated he was currently taking only the medication for his seizures because he was unable to afford his other medications. The plaintiff testified that the medication had improved his condition and that sometimes he experienced two seizures a month while other times he might not have a seizure for two months. He stated that he also had problems with concentration. The plaintiff testified that he had problems with his right shoulder and was unable at time to use his right arm and right hand as a consequence of the car accident.

The vocational expert ("VE"), Carey Washington, was asked the following hypothetical:

> Assume that I should find that we have a man who is, and in my first question, I'm going to put him in his late forties, say forty, approximately forty-nine years of age. Assume that I should find that due, that he has an eighth grade education and is literate. Assume the work experience that has been described here today, particularly the work as a cabinet builder, I guess you—what, what is that term you use, cabinet—assembler. Would there be, assume that I should find that due to his combination of impairments, including musculoskeletal impairments to the back, neck, leg, that would limit him to –for his, for the first question, I will say sedentary, unskilled entry-level, routine, repetitive jobs, but that job that, should there be

11

> seizure involvement, would not expose him to excessively dangerous or hazardous conditions. Would there be jobs that would fit that description that would exist in significant numbers in this area of the country?

(Tr. 442-43). The VE responded that there were jobs available at the unskilled, sedentary level and provided the following examples: inspector or folder, DOT code 789587-014, with approximately 8,000 to 10,000 jobs; weigher, DOT code 929687-062, with approximately 6,000 to 8,000 jobs; grater, DOT code 781381-034, with approximately 8,000 to 10,000 jobs; ticketer or marker, DOT code 652685-098, with approximately 6,000 to 8,000 jobs. The VE testified that the above-mentioned jobs would be entry-level, not highly stressful and would not expose an individual to dangerous machinery. The VE further explained that the ticketer job would entail production and that factor should be considered but other than that it would meet the criteria in the hypothetical (Tr. 442-44).

The VE was then asked by plaintiff's counsel to assume that the plaintiff would have seizures one to two times a month lasting several minutes and causing incapacitation for several hours thereafter; the seizures would disrupt co-workers; he would need more supervision at work than others; he would need to take two unscheduled breaks on normal day for up to 15 minutes; he would be capable of low stress work; his condition would likely cause good and bad days; and he would miss about three days of work each month because of his condition. The VE responded that missing two days of work each month because of seizures would not preclude the plaintiff from working the cited jobs but would be of concern to an employer with regard to keeping him in that position if it continued on an ongoing basis. The VE testified that if the plaintiff would miss three days each month totaling 36 days a year it would preclude him from working because no employer would tolerate that much absenteeism. The VE stated that all of the jobs he cited except for the ticketer position would be considered low-stress. The VE was then asked to consider the restrictions articulated by the ALJ as well as the additional restrictions that the plaintiff would

have deficiencies of concentration and persistence of pace that would prevent completing a task in a timely manner up to one-third of the work day. The VE responded that based on those restrictions, the plaintiff would be prevented from performing the cited jobs. The VE further testified that the plaintiff would not be able to do the cited jobs if it was assumed that his ability to get along with others was severely or substantially restricted as well as the plaintiff having only a fair ability to timely complete tasks and being capable of coping with only minimal levels of stress (Tr. 448-53).

## **ANALYSIS**

The plaintiff alleges disability as of March 26, 1994, due to problems with his back and legs, epilepsy, diabetes mellitus, high blood pressure, thyroid problems, and depression. Upon remand for a third hearing, the Appeals Council directed the ALJ to give further consideration to the opinion of examining source Dr. Schear and explain a rationale for accepting or rejecting his conclusions, to further evaluate the plaintiff's mental impairments in accordance with the special technique described in 20 C.F.R. §404.1520a, and to obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on the plaintiff's occupational base (Tr. 370-71). The ALJ found that the plaintiff could perform a reduced range of sedentary work and could perform jobs such as an inspector/folder, weigher, and grader (Tr. 24-27). The plaintiff alleges that the ALJ erred by (1) failing to award the plaintiff benefits on the basis of his SSI application filed in January 1997 (pl. brief 17-18); (2) failing to properly assess the plaintiff's mental impairments (pl. brief 18-21); and (3) failing to properly assess the plaintiff's residual functional capacity (pl. brief 21-23).

*SSI Disability*

The plaintiff first argues that he should have been found disabled for the purposes of SSI as of his 50th birthday on April 28, 2002, pursuant to the Medical-Vocational Guidelines ("the Grids"), pt. 404, subpt. P, app. 2, §201.10 (pl. brief 17-18). As noted above, the plaintiff did file an application for SSI on January 7, 1997. However, according to information received from the Denver Regional Office by the defendant, the application was denied for excess resources[3] (def. brief 1, n. 1). This determination was not appealed and, therefore, is not at issue here.[4] The time period for reopening has long passed.[5] Moreover, the plaintiff's complaint before this court does not allege that he was disabled for purposes of SSI, but only contests the denial of DIB benefits. In sum, the plaintiff's application for SSI benefits is not at issue in this case.

*Mental Impairments*

The plaintiff next argues that the ALJ failed to properly assess his mental impairments. When there is evidence of a mental impairment that allegedly restricts a claimant's ability to work, the ALJ must follow the procedure for evaluating mental impairments set forth in 20 C.F.R. §404.1520a. *See also* 20 C.F.R. §416.920a. The regulations were amended on August 21, 2000, to provide that the five-point scale to rate the degree of limitation in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace), is: none, mild, moderate, marked, and extreme. *See* 65 Fed. Reg. 50774 (Aug. 21, 2000), 65 Fed. Reg. 60584 (Oct. 12, 2000).

---

[3] *See* 20 C.F.R. §416.202(d) (stating resource requirement to be eligible for SSI benefits).

[4] *See* 20 C.F.R. §416.140 (stating that your eligibility for SSI benefits is an initial determination); 20 C.F.R. §416.1402 ("An initial determination is binding unless you request a reconsideration within the stated time period, or we revise the initial determination.")

[5] *See* 20 C.F.R. §404.988 (stating conditions for reopening).

The regulations further provide for a four-point scale to rate the degree of limitation in the fourth functional area (episodes of decompensation), which is: none, one or two, three, four or more. *Id.* While the ALJ is no longer required to complete the PRTF (a mental assessment form that was once attached to hearing decisions), he instead must "document application of the technique in the decision." *See* 20 C.F.R. §§404.1520a(e)(2), 416.920a(e)(2). The regulations now provide:

> At the administrative law judge hearing and Appeals Council levels, the written decision issued by the administrative law judge or Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §404.1520a(e)(2).

The plaintiff argues that while the ALJ did make a function-by-function assessment as set forth in the regulations (Tr. 24), she did not explain her assessment, nor did she provide a rationale as to why the plaintiff's mental impairments were found to be only mild in each of the categories. As noted by the plaintiff, the Appeals Council's remand order specifically directed the ALJ to re-evaluate the opinion of Dr. Schear[6] and explain a rationale for accepting or rejecting his conclusions (Tr. 370). In the hearing decision, the ALJ stated:

---

[6] As set forth above, Dr. Schear diagnosed the plaintiff with features of pain disorder due to psychological factors and general medical condition; seizure disorder, by history, by plaintiff's self-report; and osteoporosis of the neck and back, by history, by plaintiff's self-report. Dr. Schear stated that the plaintiff's current psychometric test results are considered to be a lower bound estimate of his true ability. Performances are generally within the low average to average range, and achievement abilities are below the plaintiff's formal academic achievement. Dr. Schear stated that the plaintiff's ability to understand and follow simple instructions is good. His ability to get along with others in a work environment is fair to poor. His ability to sustain focused attention that would permit timely completion of assigned tasks is fair. He is likely to experience difficulty coping with minimal levels of stress. The plaintiff's achievement abilities ranked at the fifth grade level, and his IQ was in the low average range with a score of 81 (Tr. 305-08).

15

> In evaluating the claimant's mental impairments. I have given more weight to Dr. Thurmond's conclusions that Dr. Schear's findings. As Dr. Thurmond has been the claimant's treating physician since 1995, he has the advantage of seeing the claimant over a long period of time and is in a better position to evaluate the claimant's overall mental functioning. On the other hand, Dr. Schear during his consultative examination saw the claimant on a one-time basis, and his conclusions are limited to observations and testing from that date. In addition, Dr. Schear indicated in his report that there were no medical records available for his review. Thus, he did not have the benefit of other evidence showing a history of the claimant's mental condition.

(Tr. 23).

As argued by the plaintiff, Dr. Thurmond was not evaluating the plaintiff's mental condition in the Seizures RFC Questionnaire he provided (Tr. 387-91). He was evaluating the restrictions caused by the plaintiff's seizures. The plaintiff argues, "Thus the ALJ is comparing apples to oranges and provides a completely unsupportable rationale for rejecting Dr. Schear's conclusions" (pl. brief 20). This court agrees. Accordingly, upon remand, the ALJ should be instructed to provide a rationale as to why the plaintiff's mental impairments were found to be only mild in each of the categories and to reevaluate the opinion of Dr. Schear and explain the reasons for accepting or rejecting his conclusions. The ALJ should be further instructed to consider the evaluation of Dr. Steiner (Tr. 118-19), which was not mentioned in her decision.

The plaintiff also argues that the ALJ failed to explain why the plaintiff's descriptions of his mental functioning impairments were not accepted as credible (pl. brief 21). A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence. 20 C.F.R. §§404.1529(c)(4) and 416.929(c)(4). Furthermore, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence [he] relies on in evaluating the claimant's

16

credibility." *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001). Social Security Ruling 96-7 states that the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record." SSR 96-7p.

The plaintiff testified at the hearing that he had short-term memory problems. He further stated that he was placed on medication to treat depression but was not currently taking the medication because he was unable to afford it. He explained that he was currently experiencing problems caused by his depression such as an inability to deal with others. The plaintiff also testified that he regularly experienced memory problems (Tr. 420-25). The ALJ stated in her decision that the plaintiff's daily activities, lack of emergency room visits or hospitalizations for pain, and lack of strong painkillers for long periods of time were not consistent with his alleged disabling complaints (Tr. 24). However, it does not appear that the ALJ explained why the plaintiff's descriptions of his mental functioning impairments were not accepted as credible. Accordingly, upon remand the ALJ should provide her specific reasons for the finding on the plaintiff's credibility with regard to his alleged restrictions of his mental functioning.

### *Residual Functional Capacity Assessment*

Lastly, the plaintiff argues that the ALJ failed to evaluate his residual functional capacity ("RFC") as required by Social Security Ruling ("SSR") 96-8p. SSR 96-8p requires that the RFC assessment "include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." This ruling further provides:

> In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the

17

> case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

SSR 96-8P, 1996 WL 374184, *7.

The ALJ is also required to include in his/her RFC assessment, "a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." *Id.* Significantly, the "RFC assessment must always consider and address medical source opinions," and in cases where the assessment conflicts with an opinion from a medical source, the ALJ "must explain why the opinion was not adopted." *Id.*

> SSR 96-8p provides in part:
>
> The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities. At step 4 of the sequential evaluation process, the RFC must not be expressed initially in terms of the exertional categories of "sedentary,"light," "medium," "heavy," and "very heavy" work because the first consideration at this step is whether the individual can do past relevant work as he or she actually performed it. RFC may be expressed in terms of an exertional category, such as light, if it becomes necessary to assess whether an individual is able to do his or her past relevant work as it is generally performed in the national economy. However, without the initial function-by-function assessment of the individual's physical and mental capacities, it may not be possible to determine whether the individual is able to do past relevant work as it is generally performed in the national economy because particular occupations may not require all of the exertional and nonexertional demands necessary to do the full range of work at a given exertional level.

SSR 96-8P, 1996 WL 374184, *3.

> Also, 20 C.F.R. § 404.1545(b) provides:
>
> Physical abilities. When we assess your physical abilities, we first assess the nature and extent of your physical limitations and then determine your residual functional capacity for work activity on a regular and continuing basis. A limited ability to perform certain physical demands of work activity, such as

> sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching), may reduce your ability to do past work and other work.

20 C.F.R. §404.1545(b).

As argued by the plaintiff, the ALJ's RFC assessment provides no indication as to how long the plaintiff is able to sit, stand, and walk, or the frequency with which the plaintiff could perform activities such as bending, stooping, squatting, etc. (Tr. 24, 27). Accordingly, upon remand, the ALJ should be instructed to perform a proper function-by-function assessment of the plaintiff's functional capacity.

## **CONCLUSION AND RECOMMENDATION**

Based upon the foregoing, this court recommends that the Commissioner's decision be reversed under sentence four of 42 U.S.C. §405(g), with a remand of the cause to the Commissioner for further proceedings as discussed above.

s/William M. Catoe<br>
United States Magistrate Judge

May 23, 2006

Greenville, South Carolina